Good morning, Your Honors. May it please the Court, my name is Rachel Fazio and I'm here representing the Plaintiffs' League of Wilderness Defenders. We are here today because defendants have approved an intensive logging project which will remove 70% of the trees across 2,554 acres and will completely alter the unique forest ecosystem which presently exists in the Lookout Mountain Unit of the Pringle Falls Experimental Forest. Unfortunately, in approving this project, defendants failed to follow the procedures of NEPA and thus we have a circumstance where neither the public nor the agency has been informed as to the environmental impacts of this project. Specifically, defendants have failed to rigorously explore all reasonable alternatives to the proposed action. Now, failing to explore alternatives is somewhat different from describing the consequences of the action that they are about to take. Do you agree with that? I actually believe that you must do a comparison of competing alternatives in order to get to the question of what the impacts will actually be from the project. Well, I disagree with you at this level. If I'm going to do one thing, I tell you I'm going to do one thing, and I tell you what the consequences are of that thing, I have told you what the consequences are. Now, if I say I'm considering three different things and then I tell you what the three different consequences will be, I've given you then a comparison. Right. You're saying that a proper comparison and alternatives weren't set out, but I'm not sure that that answers the question as to whether or not, as to the alternative they've chosen, whether they have sufficiently told you what the consequences of that choice will be. They have failed in both respects. Tell me why they failed in the respect of not telling you what the consequences of doing this will be. Well, specifically with regard to imperiled cavity nesting species, the EIS simultaneously claims that the project will benefit these species in the long term, and then the government says, well, actually, we can't prepare this analysis because we find that it is unwarranted. So without preparing any analysis to actually analyze the impacts of this project on future snag recruitment, large dead trees that are necessary to support the imperiled species such as the Lewis's woodpecker and the white-headed woodpecker, they did not provide an analysis of what actually will occur in the future. They claim that it was unwarranted, but at the same time in their EIS, they assert that this project will actually benefit these species over time. They don't have a basis for making that conclusion. They have not analyzed the effects and told the public what impact this project will have on the viability of cavity nesting species. So that's the main failure with regard to the project. I think it's pretty clear from the EIS that snags that we will or will not have, but your argument is they've not carried it the next step to tell us what the consequences will be for species that depend upon snags. Well, what they have disclosed is how many snags currently exist in the project area, and they are not going to be removing those snags. However, the sole purpose of this project is to reduce natural mortality of trees. Natural mortality of trees from beetles or fire equate to large snags good for wildlife. So they are undertaking a project, and the tables in their EIS indicate that over a certain number of acres, they will preclude or retard snag recruitment or natural death of trees for 30 to 50 years on some acres, 75 to 150 years on some acres, and 150-plus years on over 1,000 acres in the project area. And they have not disclosed what impact that will have on these already sensitive species that exist in this project area, not to mention the fact that this project area, although not the best habitat in the world for these species, it doesn't have optimal levels of snags, it has the best habitat in the watershed for these species, and they will be completely altering this ecosystem, precluding the very trees, dead, large snags that these species depend on. That's going to have an impact, and they don't disclose that. Okay. Now, just so you started off with a dramatic statement, it's going to remove 70 percent of the trees in 2,500 acres. Yes. Okay. Now, if we were to send this back, what is the proposal, the outcome that you are looking for? The redesign and, therefore, the alternative. So if they articulate it and adopt your reconsider what you think would be the appropriate approach, is it your implication that they won't be removing 70 percent of the trees over 2,500 acres? Yes. And those are the trees in excess of what, 12-inch diameter or 21-inch diameter or both or what? Yes. We've actually, plaintiffs proposed two possible alternatives, small diameter thinning only, which would be removing trees 12 inches in diameter or less, and a large tree retention alternative, old growth alternative, if you will, 21-inch diameter limit was what we proposed. We did that based on the fact that on the east side, for the east side screens, that's what has been set as the level. But, obviously, any large tree diameter retention would be beneficial. It would maintain the large trees on the landscape. It would maintain a density that could result in some natural mortality to benefit these cavity nesting species. And what would be the percentage of trees removed under your 21-inch hypothesis? I do not know, but it would be much less. Then it would at least, if it was a 21-inch diameter limit, it would retain 21,000 more trees than they would be removing. And you can't make the, you haven't made the calculation? I have not made that calculation, but it would be much less intensive, and it would maintain density levels higher and potentially high enough to actually have some very limited mortality over the next few years that would, or decades, as opposed to what they're proposing, which will essentially eliminate mortality for over a century. There, I think the main issue we have with the range of alternatives is that they started off this project with a study plan that was developed by a different entity of the Forest Service. And they incorporated that study plan into the purpose of need and unreasonably narrowed that purpose of need because it incorporates the exact prescriptions that that study plan calls for. Here's my problem with that part of the argument. This is a forest area set aside specifically for study, and the plan is designed to give us controls, various different kinds of thinning to see what happens with respect to growth patterns and vulnerability to beetles and so on. So this isn't the kind of project we ordinarily see, which is going to be logging for certain purposes or salvage logging for certain purposes and so on, where it's management of the forest, but we're not talking about sort of experiments or trying to learn things. I have trouble using NEPA to require what in effect is going to be them to design their experiments differently by having the same range of alternatives and the same mode of analysis. How do you respond to that? I respond to that by saying that Congress passed NEPA. NEPA applies to national forests. It applies to experimental forests. There is no exception. There has been no narrowing of the requirements of NEPA by the Research Act. It's a very broadly stated act. But I think really more to the point, Your Honor, is this action has consequences. And NEPA is designed to actually divulge what those consequences are. And you cannot get at that question without having a comparison with other competing alternatives. You just simply can't, because you walk into the room saying this is what we're going to do, and then you backfill and you support your decision that you already made, rather than looking at, well, is there a better way to potentially do this? If you look at the study plan and the research questions that are restated in the EIS, they are extremely broad. They are not narrowed to the point that only one thing can happen, if I may. Question number one, what set of fuel reduction treatments best accelerates the development of large trees, while over the long term reintroduces natural disturbance processes that provide greater ecosystem resiliency? What in that question says we must log the largest trees on the landscape in order to answer that question? Wait a minute. Is that what the plan does? Are they going to log the largest trees on the landscape? They're going to log a certain percentage of the largest trees on the landscape. My understanding of the plan, and I may be wrong on this, is that they're doing thinning, and that they're starting with the small trees, and they're logging as many trees as they need to going up in size until they got to the degree of thinning that they want. And they're not starting with the big trees and working down, they're starting with the small trees and working up. Do I misunderstand the study? They are logging, on average, 30% of the large trees that are available across the landscape. You're not answering my question. You said the largest trees on the landscape are the ones they're going to be cutting. And I said, I understand the study. What they're doing is, depending on the area, they're thinning to different degrees, and the way they're thinning is they're starting with the small trees and working toward the larger until they've gotten to the degree of thinning they desire. Am I misunderstanding the study? No, but the result of that is that 30% of the largest trees on the landscape will be logged. Largest? Sounds as though none of the largest are going to be logged. I'm certain that in some units, some of the largest trees will be logged. This is an intensive logging project. They are logging over 22,000 old growth trees. They are logging, and it doesn't stop at 21. I guess I understand what you're saying, but your use of the word largest is a somewhat idiosyncratic use when, if I've understood the study properly, and so far you haven't told me that I've not understood it properly, they are starting with the small trees, they're working up in size until they reach the desired degree of thinning. Yes. Okay. How did you calculate the 22,000 then? It's calculated by the record. They indicate that currently there are 100 trees per acre, and of those approximately 28 are 21 inches in diameter or larger. They don't give us any more specific information than that. And then they indicate that they will be, on average, logging nine trees per acre that are 21 inches in diameter or over. They don't let us know if there are 40-inch diameter trees that they're logging, if there are 30-inch, if there are 27. All we know is that they're over 21. What do we know? And this I've not seen in the record, and it may be that it's simply not there. If you drive south from Benton toward Klamath Falls, all you see is either trees that have been killed by beetles or a devastated landscape because the trees have been cut. How far toward the Cascades does that beetle infestation go, and how close to this forest does it go? I am not aware of that information. I do not believe that it's in the record. Okay. But what is in the record are the studies that have looked at beetle activity on this particular forest, and what they have found is that even at stand density levels much higher than currently exist in the project area, that there is only a risk of 5% to 15% mortality of trees over 10 to 20 years, and that it is not the imminent risk of catastrophic loss of overstory trees that the EIS implies, or actually they don't imply it, they actually state it. And that is our second claim, which is that they have inaccurately represented the risk level of the current condition on this forest, that the risk level is much smaller to the loss from natural processes than the guaranteed loss of trees from the logging project itself. Did they calculate the risk of loss, of catastrophic loss? No. Okay. But you just gave us a figure, didn't you? You just gave us a 15%. I gave you a figure from an actual scientific study that was performed on the Lookout Mountain Experimental Forest, where they went into a stand of old growth that had basically been untouched, and they looked at what type of natural mortality had been caused by beetles, and that is the level that they found. All right. Are there any studies that tell us what level of catastrophic loss is tolerable or intolerable? You're dealing with something that you've labeled a catastrophic loss. I didn't label it. Typically, we are dealing – typically when we talk about catastrophes, we are talking about things for which there's a very, very small chance of it happening, but the consequences are enormous. Okay. In this circumstance, it's the Forest Service that has characterized the loss as catastrophic. Are they wrong on that? Yes, as far as – insofar as what the word catastrophic means, which is a large event that damages everything. I mean, catastrophic, it has – And the beetles and the fire wouldn't classify as a catastrophic loss if those were to occur? No, not even – not by any definition. Okay. Why? Well, first of all, the EIS itself acknowledges that there is no loss of – I mean, there is no risk currently of a stand-replacing fire. They are very clear that the majority of the project area at most under the worst fire conditions ever, 97th percentile, very rare, would experience a surface fire. Some areas might experience passive fire, which is a surface fire with individual torching of some trees. That is the current condition on the lookout mountain unit today. There is no risk of catastrophic wildfire. With regard to beetles, the only evidence in the record that describes what happens in stands when they're actually much denser than the stands in the lookout mountain unit is a very small percentage of loss in the stand density index. Over 10 or 20 years, maybe 5 to 15 percent. One study had one unit that lost 19 percent of the stand density index, but nowhere near the 51 percent of stand density index that will be lost from the logging project. So by not accurately representing the current condition and the no-action alternative, they have just utterly failed to divulge to the public what the impacts of this project will be. Are they using the wrong figures here? Are they using the wrong statistics? Have they miscalculated things? They simply have stated, made conclusory statements without support, and the scientific studies that are in proximity to those statements don't stand for the proposition that currently there is an imminent risk of catastrophic loss of overstory trees. There's nothing in the record that supports that assertion. The government's argument is we never really meant to say that. Are you suggesting that there's no need for the experiment? They have the ability to do an experiment on this forest. It is an experimental forest. But there is no need to do the experiment in this way to save this experimental forest, to prevent a catastrophic loss of this experimental forest. No. There is no need to do this experiment for that purpose. If they want to do the experiment to study things, that's different. But the misrepresentation made in this case is fundamental, because when the public reads this document, they think, well, what are my choices? My choices are I don't really like logging, don't do logging, but the whole entire forest is going to be at imminent risk of catastrophic loss. All those big trees that I care about, they're going to be gone, because the beetles are going to come in or the fire is going to come in. That is not supported by the record at all. But the public looks at that and goes, oh, I don't really want to lose that, and research is important. So maybe it's okay that they do this really intensive logging project that's going to remove 51 percent of the stand density index, 70 percent of the trees over six inches in diameter. Okay. You're at the end of your time. Let's hear from the Forest Service, but we'll make sure you get a chance to respond. Okay, thank you. Good morning, and may it please the Court. My name is David Gunter, here for the United States Forest Service. With me at council table and in front of the bar is Val Black from the Office of General Counsel of the USDA, and Scott Horngren, who represents Amicus Inter4Pacific in this matter. Amicus. Inter4Pacific. What's at stake in this case is the Forest Service's ability to set its research agenda for small experimental forests that have been set aside for that purpose. When the Forest Service develops research plans for these experimental forests, NEPA doesn't require it to consider alternative experiments that would fail to meet its research goals. NEPA also allows the Forest Service to set a risk tolerance that it's going to use in managing the forest, and to maintain a level of density in the forest that will maintain that acceptable level of risk. I'm with you on much of that, but I confess I'm somewhat affected by what we just heard, that you may be justifying this experiment, which the Forest Service is not only entitled to do, but in some respects obligated to do, based upon dire warnings that you're also saving the forest that may not be quite justified by the data that you've got. How do you respond to that? Your Honor, I respond to that by saying that's a dispute about words. There's no dispute over what the scientific studies... Yes, it is a dispute about words, but words that mean something. Yes, okay. So I'll just start with the point that there's no dispute within the scientific studies about what the risk of beetle infestation is, and Loud hasn't raised any dispute like that. So the real question is, how are we characterizing those studies? And in those studies, you'll find even the word catastrophic to be used. So, for example, in the FedEx study that we cite at Supplemental Excerpts of Record 158, the author of that study describes recent epidemic of native forest insects as catastrophic events. The Oliver study that was cited both in... Counsel, is the risk of catastrophe the risk to this forest or the risk to other forests for which this is now an experimental forest in which we're going to conduct an experiment in hopes of being able to prevent catastrophic events in forests outside of Deschutes? Well, the data that will come from the study will be used in forests outside of Deschutes, but the risk the Forest Service is concerned about here is specifically risk to this forest, and for two reasons. One is that densities in this forest are above the upper management zone, which is that threshold that's been scientifically determined in the literature that goes back 20 years as an acceptable, responsible level of density to manage the forest in order to avoid an increasing accrual of risk. This forest is experiencing those kinds of risks now because of its density, but also there's the risk in this forest of losing existing studies and losing the opportunity for future studies. So in the statement of purpose and need that the Forest Service used here, it identified protecting existing research and protecting opportunities for future research as two reasons why it wanted to thin this forest to the upper management zone or below. And so when you're talking about whether risk is catastrophic or not, as Judge Fletcher is concerned about, you have to look not only at the probability that something will occur, but also the consequences. It may be true that in some of these studies the consequences of beetle infestation were 15 to 20 percent mortality. That does not take into account fire risk. But more importantly, it does not take into account that that 15 to 20 percent may be the very trees that are currently important in an ongoing long-term study. So by thinning to UMZ or below, the Forest Service is maintaining its ability to protect those studies by controlling now where the mortality occurs so that later mortality will not occur in an uncontrolled way that has a catastrophic effect on research that is ongoing. Now, I think I know the answer, which is to say there is none in the record. But I'll ask you the same question I asked Ms. Fazio, and that is, as you go east from that highway, excuse me, as you go west from that highway that runs from Bend down toward Klamath Falls, how far does that beetle damage go? How close to this forest does it go? Judge Fletcher, I don't have personal knowledge of that, and it's not on the record, but I'm informed by some of the folks that are here from the forest that Pringle Falls Experimental Forest is only a few miles east of the – I'm sorry, a few miles to the west of the highway that you were describing. A few is not quite right. Okay. As I said, I don't have personal knowledge. It depends on how you define a few. It looks to me on the map as though it's quite a few. Okay. It may be 25 miles. Well, the answer is the beetle infestation and damage that you have observed from that road, I don't know how far toward the experimental forest it goes, but certainly there is a – That's enough of an answer. Okay. If you don't know, you don't know. Yeah. I don't know is the answer. I'd like to direct the Court's attention back to the statement of purpose and need and to the allegation that the plaintiffs made in their briefs, and again here, that there was only one alternative that could have been selected here, that the alternative two, that is the study plan, was essentially preselected and that the Forest Service did not have a reasonable range of alternatives. The purpose of this project is not, as represented in the plaintiff's briefs, to completely minimize tree mortality. The purpose was also not to implement the study plan exactly as it was presented in that document. The purpose of the project, as indicated in the EIS, is, quote, That need comes from observations on the ground, currently in the Pringle Falls Experimental Forest. Well, you know, if that's the only purpose, I think you're in trouble. If your purpose is to conduct a scientific experiment, you're on stronger ground. Well, I was about to get to that, Your Honor. There are two purposes. One is risk, and, in fact, reducing risk was what initially prompted the Forest Service to examine whether it should take the opportunity to conduct a research project in this area. And so, in the end, the EIS had two purposes. One was to thin the area to UMZ or below, that is to the scientifically determined density level, that is a threshold for beginning of increasing risks. And the other was to answer these six research questions at the same time. And so the Forest Service put together two alternatives to do that. Alternative two followed a number of the parameters of the study plan, but the EIS and the statement of purpose and need did not say that the parameters of the study plan are the statement of purpose and need. And we see that because the Forest Service also examined alternative three. If you look at page eight of the EIS, you'll see a key issue identified with alternative two, and that is the potential impact on spotted owl habitat. And so the Forest Service devised alternative three, not simply to scale back the number of acres that were involved in alternative two or to decrease the number of trees that might be harvested, but because alternative three would specifically address the potential issue of spotted owl habitat. What the Forest Service found from a biological opinion from the Fish and Wildlife Service is that alternative two would not have a significant impact on spotted owls, and so the Forest Service chose alternative two because that would provide the greatest scientific benefits. But what the EIS shows is that the Forest Service was willing to trade off some scientific benefit in order to achieve an environmental benefit if there was any to be achieved. That does not look like a predetermination that the study plan is the only possible alternative that would have met its purpose and need here. What alternatives have been studied with respect to other nesting cavity-dependent species? You mean in this project or in other projects? This project. Well, alternative two and alternative three. We heard, I mean, one of the objections has been the way this is going to go forward, if we allow this to go forward the way the Forest Service wants to do it, is that we will see a significant reduction in the number of snags, a so-called gap in the number of snags, and the species dependent upon cavities for nesting or dependent in other ways on snags will be hurt. How much studying of that has been done with respect not only to alternative two but with respect to alternatives? Your Honor, you will see in the EIS a number of pages dedicated to the issue of cavity-dependent species. But let me address the specific issue of snags and correct what may be a misapprehension. No existing snags are going to be removed as a result of this project. The number of snags will remain constant. And I would also point out that the forest is currently meeting the forest plan's direction as to number of snags per acre. So with respect to the issue you raise, the forest currently has no need to see an increase in the number of snags in these areas, and the project itself is not going to cause a decrease. So the only question is what will happen? No, that's not the contention. The contention is because you're going to do thinning, we're going to have less natural mortality, and we will therefore have fewer snags going forward. Not that the existing snags will be cut, but that as this experiment goes forward, there will be fewer snags generated. Do you disagree with that projection? I mean, that's what we heard. No, I agree that there will be fewer snags generated, and the EIS spells that out and clearly discloses it. What the Forest Service did was to commit... And once having disclosed that, how much analysis is there of the consequence of that for cavity-dependent species? Your Honor, I don't recall any study of what the numbers might be, of, you know, how populations of cavity-dependent species will respond. Instead, what the Forest Service did, after noting that the number of existing snags will remain in place, was to conduct a qualitative analysis of what would happen over time to the rate at which new snags are recruited or created. What the Forest Service determined or hypothesized was that as density in the forest increases, the largest trees, all of which will remain in place under this project, will grow to a larger size. And that is well established in the scientific record. I don't think there's any dispute about that. So that as those trees start to die, they will in the long term create larger and more valuable habitat for those snag-dependent species. Obviously, there's a gap during that time where fewer snags will be recruited, but during that time, as I mentioned, the existing number of snags in the forest currently meets the forest plan's direction, and therefore there's not an immediate need to recruit new snags. When my opposing counsel said that further analysis of that question was unwarranted, I don't think that was quite accurate. After doing that qualitative analysis, the Forest Service also did attempt to do a quantitative analysis in which it would actually determine the number of snags that would be recruited and that would be in place over time in the forest. And what you'll find is that the Forest Service found that effort to be unfruitful. They attempted to build a computer model that would analyze the mortality of trees over time, but there were too many variables involved in that computer model. So what was unwarranted was going through the expense of trying to model that snag behavior when the end result would be unreliable. And I would hate to be back here in two years defending a decision again on the grounds that we had a computer model that was unreliable. Much better, I think, for the Forest Service to do what it did, which was disclose in the record what the uncertainties were, explain why it couldn't come up with numbers with respect to snag recruitment, but also explain based on the science what it expected to happen on a non-quantitative basis. Let me turn for just a moment to the diameter limits argument that we heard about, the arguments that even though the thinning would occur from the smallest trees to the largest and so the largest trees on any given acre will remain, that the Forest Service should have considered some alternatives that would have prohibited it from harvesting any trees under 12 inches in diameter, I'm sorry, over 12 inches in diameter, or any trees over 21 inches in diameter. The question under NEPA for the Court in considering whether the Forest Service reasonably rejected those alternatives was simply will those alternatives meet the purpose and need of the project? And with respect to the two purposes and need I mentioned earlier, that is thinning to UMZ or below and answering the Forest Service's research questions, it's clear that neither one of those diameter limits alternatives would meet the Forest Service's purpose and need. None of them would allow thinning to the UMZ threshold. And, in fact, I think it may have been Judge Fisher who asked whether we had any ability to quantify that. In the EIS, the Forest Service did examine this question in one area that is subject to the east side screens of about 266 acres. It found that in the absence of a 21-inch diameter limit, the Forest Service would thin to UMZ or below, and UMZ would be about 70, which is a value associated with stand density index. If there were a 21-inch diameter imposed, the stand density index remaining after treatment would be about 90. So there is a substantial difference in the ability of those diameter limits to meet the risk threshold that the scientific literature suggests is an appropriate tolerance level. It's also true, though, that none of Loud's alternatives would allow for the experimentation that the Forest Service needs to answer its six research questions. And here, the key difference is that the Forest Service has two alternatives, Alternative 2 and Alternative 3, focused on the level of density that would remain in the forest after the harvesting was done. The key element for the Forest Service here is to control that level of density, both so it can control the level of risk that remains in the forest, but also so that it can validly compare two different areas that have been thinned to the same level. Loud's alternatives, on the other hand, a diameter limits alternative, doesn't control what remains. It only controls what comes out. And so the trees that remain may be at different levels of densities. They may not be comparable, and they may not produce valid scientific results. So even though those diameter limits alternatives might minimize tree mortality and might prevent some tree mortality among those trees that have to be harvested above 21 inches but are not the largest trees, that wasn't the Forest Service's purpose and need here. The Forest Service had a risk reduction purpose and a research purpose that may not be compatible with minimizing the tree mortality that remains. Unless the Court has further questions, I'll just finish with some final thoughts. All right. On the whole, this extensive EIS demonstrates that the Forest Service established a reasonable purpose and need that is specific to the purpose of the experimental forest, as well as the purposes that the Forest Service intends to have in mind to obtain data for use in other forests. It based that purpose and need on the scientific literature. It developed alternatives based on that literature and based on input from other federal agencies and examined those alternatives carefully. It fully disclosed the risks that are present in the forest, the risks that it expects to accrue over time, and the number of trees that have to be harvested in order for it to carry forward with Alternative 2, its selective alternatives. Could I interject just to clarify? In terms of the development of the study plan, there's reference to peer review and also outside evaluations. Could you elaborate on each of those just a bit so we understand what exactly was done? Yes, Your Honor. And I'm not sure that I am able to comment on the distinction between peer review and outside collaboration. But if you look at the beginning of the study plan, which is in Volume 2 of the EIS at the back, in the first couple of pages of that, it lists the reviewers that took a look at the study plan and determined whether it was scientifically rigorous. Some of those reviewers were within the Forest Service and some were outside. That was the peer review, wasn't it? And then there was a reference to a double-blind study of outsiders. Yes, I do recall that. I wasn't clear about what that entailed. And I'm sorry, Your Honor, I do know that it was reviewed in a double-blind fashion, but beyond that, I can't give you any more details. You don't know where they came from or their qualifications or anything? No, I'm sorry. I don't. Now, when you say some of the peer reviewers were from the Forest Service and some were from academia, is that what you said? Yes. What does this PSW Research Station mean? PNW Research Station. PSW and then there's PNW. They're both. Okay. So PNW is Pacific Northwest Research Station. I assume PSW then is Pacific Southwest. Okay. And does that mean that anyone with either of those two designations is an employee of the Forest Service? Yes. The Pacific Northwest Research Station is one of the research arms of the Forest Service. The reason I ask that is that there's one person, Mr. Fitzgerald, from Oregon State University. Everybody else is an employee of the Forest Service. That may be true, Your Honor, but I would point out that that's not necessarily inappropriate. The Forest Service has to have. I'm not saying that. Okay. But I think you said you suggested in your brief sort of summary description that there was more than one person from outside the Forest Service who was a peer reviewer. I'm sorry if I was in error on that, Your Honor, but I did point you to those pages, and I hope that the person will find it. There's no suggestion of sort of deliberate misleading, but I do think it was an overstatement as to how many outsiders were in that peer review group. Okay. And I'm sorry about that, but the fact remains that under this Court's case law, the Forest Service has to be able to rely on the opinions of its own scientists. And there are no contrary scientific opinions. I just wanted to know what it entailed. If you would like, Your Honor, I can provide you with some supplemental information on that once the argument is over. I don't know if you need to. Okay. Thank you. In that case, Your Honor, the judgment of the district court should be affirmed. Thank you. Thank you. Ms. Fauci would like two minutes. I thought I got a whole other 20 minutes to go. Not quite. Okay. I guess just a couple of things. With regard to the analysis or lack thereof of the impacts to the cavity nesting species, the Forest Service, while they didn't they claim that they can't actually assess how many snags will be precluded from existing. But throughout their EIS, they continually quantify how effective their thinning treatments are going to be. So you can't have it both ways. You can't on the one hand say we can't begin to anticipate how many snags might exist in the project area in 50 years, and then on the other hand say our thinning treatments, which are going to be well below the UMZ, are going to be effective for 150 years, meaning that there is not going to be mortality that occurs naturally during that time frame. There's going to be an impact on these species, and it may be very substantial considering this is the best habitat they have in this entire watershed. I guess I'd just like to repeat there actually is no evidence in the record that there is an imminent risk of catastrophic loss, either from fire or from beetles. I think that's very well laid out in our briefing. And that NEPA applies to this forest. And we are not saying that they can't do the research the way they want to do. What we are saying is they need to follow the procedures of NEPA so that the public and the agency can be informed as to the consequences of those actions and as to whether there may be a less impactful way to achieve answers to their research questions. Thank you. Thank you very much. Thank both sides for your arguments. League of Wilderness Defenders, Blue Mountain Biodiversity Project versus the U.S. Forest Service now submitted for decision. And that concludes our session for this morning.
judges: W. Fletcher, Fisher, Bybee, Cjj